L. A. ANDREW, Superintendent of Banking, Receiver; D. W. BATES, Superintendent of Banking, Substituted Plaintiff, Appellee, v. ALBERT N. MILLER et al, Appellees, CHARLES F. MILLER, Appellant, FRED BUTTERBRODT, Trustee, Intervener, Appellee and Cross-Appellant.

No. 42804.

DECEMBER 17, 1935.

ORIGINAL OPINION MODIFIED AND REHEARING DENIED APRIL 10, 1936.

J. C. France and M. C. Hamiel, for appellant.

C. J. Cash and J. E. Remley, for plaintiff-appellee.

Otto L. Schluter and C. J. Lynch, Sr., for intervener-appellee and cross-appellant.

ALBERT, J.—There are certain facts that are undisputed in this record. It is admitted that the town property, known as lot 2 in block 7 in the original town of Oxford Junction, Jones county, Iowa, was exempt as a homestead.

John F. Miller died intestate on the 12th day of January, 1930, seized of 160 acres of land in Cedar county, Iowa, and 357 acres of land in Jones county, Iowa. For a number of years prior to his death, and commencing in 1912, he occupied the homestead property in Oxford Junction, Iowa. Mrs. Miller died in 1924. They left three sons surviving them, Albert N., John, and Charles F. Miller. The controversy here arises over the share of Albert N. Miller as an heir in the estate of John F. Miller, deceased.

It is also conceded that on the 15th day of April, 1932, Albert N. Miller and wife executed the deed in controversy herein to Charles F. Miller, conveying to him an undivided one-third interest in the lands which Albert N. inherited from his father, John F. Miller. This deed was promptly filed and duly recorded.

The record shows that for many years prior to September 5, 1931, Albert N. Miller was indebted to the Oxford Junction Savings Bank, and on the last-named date he executed his note and chattel mortgage to that bank for the sum of $4,150. The Oxford Junction Savings Bank went into the hands of a receiver on the 5th day of October, 1931, and on June 4, 1932, the receiver of the bank instituted an action to foreclose the chattel mortgage, which went to decree on the 28th day of December, 1932, resulting in the foreclosing of the chattel mortgage, and a judgment against Miller in the sum of $3,996.75 and costs. The chattel property was sold under the decree, resulting in an application on the judgment of $660.80. In the action to foreclose, an attachment was issued and alleged levy made on all the land in controversy herein. Said attachment was issued and levy made on the 14th day of June, 1932. The validity of this attachment is attacked, and, if necessary, will be treated later in the opinion.

On the 4th day of January, 1933, the present action was commenced in equity to set aside the aforesaid deed to Charles F. Miller as fraudulent. Albert N. Miller filed an answer denying each and every allegation of plaintiff's petition, but admitting the recovery of the judgment against him on December 28, 1932, admitting the ownership of the property in controversy herein, and admitting that he conveyed the real estate to Charles F. Miller. Charles F. Miller denies all the allegations of the petition, but admits the execution and delivery of the deed from Albert N. Miller to him of the property in controversy. He de-

nies that the same was fraudulent and made for the purpose of defeating the creditors of Albert N. Miller, particularly the plaintiff herein, and alleges that the deed was made long prior to the institution of the suit against Albert N. Miller by the plaintiff, etc. At this point, Fred Butterbrodt, trustee in bankruptcy of the estate of Albert N. Miller, intervened, and issue was joined between the parties thereon; but this matter will be disposed of in a separate division of this opinion.

Numerous witnesses were introduced as to the value of the respective pieces of property, from which we conclude that the reasonable value of the Jones county land was about $42 per acre, of the Cedar county land about $75 per acre, and of the town property $1,500.

Summarizing the plaintiff's testimony, it shows that during the time that Albert N. Miller was the owner of this property, and for a number of years prior thereto, he was indebted to the Oxford Junction Savings Bank, and that he had made property statements thereto showing that he owed no other indebtedness, except what was owing to the bank. Some time in January, 1928, Charles F. Miller became a depositor in the Oxford Junction Savings Bank. This account was closed in January, 1931. At one time he had $899.88 on deposit there. He had another account in the Toronto Savings Bank. Ledger sheets of the Oxford Junction Bank were introduced showing that John H. Miller had a savings account in said bank, and at the time of his death he had $10,052.82 on deposit. This testimony comes from one Shimanek, cashier of the Oxford Junction Savings Bank. The witness further states that he never talked to Charles Miller, nor Charles Miller to him, about his business. Charles lived in Oxford Junction from 1926 until 1930. Prior to 1926 he lived in Nebraska for ten or twelve years. In 1930 he went back to Nebraska. "John F. Miller never kept a checking account. His deposits were usually made in currency, and when he wanted to use money he drew the currency out. I don't know how much currency he carried with him or where he kept it." In one of the statements made by Albert N. Miller, to the bank, as part of his assets he specified, "building on leased ground, valued at $2,500."

Albert N. Miller did not testify in this case, but he gave testimony at the bankruptcy proceedings before the referee, and the testimony that he gave is properly proven by a witness who

heard him give the testimony, and the substance thereof is as follows:

"Albert testified that he had paid no rent to his father or any person on the 160-acre Cedar county farm which he occupied since 1917. He said as to the first $1,000 that he received from his brother Charles, that he put buildings on the farm he had leased from his father. He said he put those buildings on the farm with money he had borrowed, and he considered the buildings his personal property, and so considered them when he made this deed to his brother. Said he had a letter from his brother wanting some security, and that is why he gave the deed, and he considered it merely for security. He said something about getting a note, that he had given his brother Charlie a note in 1926. Charlie had the note in Nebraska, or was supposed to have it, and he afterwards got it through the mail. Said that he had borrowed $1,000 from his brother Charlie the first time, and that he borrowed $1,000 in 1923, and $1,500 in 1926. Said that Charlie was not present when the deed was made; that he was out in Nebraska. Richmann was administrator of the father's estate and had control of the land. He (Albert) gave his wife a bill of sale of property not covered by the Oxford Junction Savings Bank mortgage. This bill of sale was for money owed her. He said he put about $2,000 of Charlie's money, and some other money, in the buildings, and that he did not attempt to put a value on the buildings. Charlie had the note in Nebraska at the time the deed was given. He borrowed some money in 1926 and gave a note to Charlie for $3,500. In 1926 he got some money from Charlie and bought cattle at different sales. Charlie paid the first $1,000 to him in currency."

Plaintiff also introduced the bank books. showing the account of John F. Miller. He kept no checking account, but only a savings account. These bank books do not show a withdrawal by John F. Miller of the amounts which Charles claims were given to him by his father. The weight of this testimony, however, is not very strong because the record shows that John F. Miller did business with one or more other banks, and no showing is made as to his accounts with such other banks. The bank account of Albert N. Miller is also introduced to show that at the time Charles made these loans to Albert no deposits thereof

were made in this bank of corresponding amounts at or near the time Charles loaned the money to his brother.

It is insisted that under the showing made the plaintiff made a *prima facie* case, and the improbability of Charles' story as to having received this money and keeping it in the basement is a very strong circumstance tending to destroy the weight of his testimony. We do not so consider it. The fact that during the time in controversy, when these loans were made, money was in hiding, and the fact that many people kept their money at home and even withdrew it from the banks, and many buried the same in their basements, is a matter of common knowledge. In ordinary times, and under ordinary economic conditions, these facts might have great weight. While they may be a circumstance to consider, we do not think that they are at all controlling in determining this question. The testimony shows that Albert N. received these moneys from the defendant Charles, and that he evidenced them by the promissory note that he gave to Charles on the 12th of May, 1926, which promissory note we have before us. Taking it all in all, from the plaintiff's showing we do not think that he made out a *prima facie* case; but we do not think that this is controlling in the final determination of the case.

It is very doubtful whether or not the plaintiff has sustained his burden of proof. However, the case being in equity and triable *de novo* here, we will consider the defendant's testimony before reaching a conclusion.

The material part of the defendant's evidence consists of the testimony of Charles F. Miller. A fair summary of the testimony of Miller is about as follows:

He has lived at Lyons, Nebraska, ever since 1916. He lived there until 1918, when he was drafted into the Army on May 1. He was in the service nine and one-half months. His occupation was farming. After the war he came back to Jones county and stayed about a month, with his father, John F. Miller. That was in February, 1919. He went back to Nebraska and stayed until 1926, when he returned on account of sickness in his father's family, and he stayed with his father at the old homestead until January, 1930, when his father died. Several times before 1926 he had returned for visits to Jones county. He made a loan of $1,000 to his brother Albert in 1920; the same amount again in 1923; and in 1926 he loaned Albert $1,500. He took no evidence

from his brother for the first two loans, but after making the third loan to him he took a note from Albert in the sum of $3,500, dated May 12, 1926, due in five years, drawing 5 per cent annual interest and 8 per cent after due. On the death of his father he returned to Nebraska, and made a visit again to Jones county early in 1932. After he went back to Nebraska, and on the 11th day of April, 1932, he wrote his brother Albert a letter, as follows:

"Dear Brother:

"As I have not heard from you regarding the security of my loan, I wish you would tend to this at once, as I have lost $2,000 in the banks already, and I am not going to take any more chances. So you will have to come across. This is final.

"Yours truly, Chas. F. Miller."

A few days after the receipt of this letter by Albert the deed was executed, recorded, and forwarded to Charles at Lyons, Nebraska.

An extended cross-examination is made of the defendant as to where he got the three items amounting to $3,500 that he loaned to his brother. His explanation is, as to the first $1,000, that when he came back from the war his father gave him this $1,000 in currency, and he took it with him in his pocket when he went to Nebraska. He was there working on a farm, or ranch, and he took this currency and put it in a glass jar and hid it away in the basement of a building on the farm where he was employed. He got good wages at the time and saved his money, and when he came back in 1920 to Jones county, his brother wanted to borrow some money and he loaned this $1,000 to him. He says that, as to this trip in 1920, he came back to loan Albert some money and pay a visit. He had some money in change, aside from the $1,000 that he had in bills in his pocket. He paid it to Albert in Albert's house. In response to a question as to whether he had more than $1,000 with him, he says:

"Not with me at that time, just a little change for expenses. My brother said he wanted to borrow some money, approximately $1,000. That was before I told him that I had the money with me. I did not tell Albert that I had $1,000 in my pants pocket. I never gave the $1,000 in for taxes at any place. I visited in Jones county at that time probably two or three weeks.

In 1916 I got $40 a month wages; in 1920 I was getting $75 a month, and it was paid to me in cash. At the present time I am getting $25 a month. When I went back to Nebraska I worked on a farm, from 1920 to 1926, for the same man. I got $65 a month the first year, and the last year I am getting $25 a month. I came back to Iowa next in 1923. The $1,000 that I loaned to Albert at that time I had earned and saved. I kept some of it in the bank at Lyons, Nebraska, and kept some of it in the house where I worked. Kept the money in a glass jar behind the wall in the cellar. I had some money in my pocket. When I came back in 1923 I brought approximately $1,100 with me. Carried it in my pocket. I did not tell anybody I had this money. Albert and I corresponded before I came back in 1923. He didn't know how much money I had with me. From 1919 to 1926 I saved approximately $400 a year. In 1923, when I came back, I had about $700 or $800 in the glass jar in the cellar, and the man I worked for paid me approximately $300 in cash, making the $1,100 that I brought back. When I came back at that time Albert asked if he could get some money. He said he wanted around $1,000. I told him he could, that I had $1,000 with me. He asked if he could borrow it, and I told him he could, and I loaned it to him. I trusted him, and I had his word for it. I did not think it would be risky to take a man's word for it, and not let anybody know about it, or have a receipt of any kind. I didn't figure it would be, with my brother. I was back to my mother's funeral in 1924. I came back on the first of April, 1926, on account of my father's health. After I came back in 1926, my father gave me $1,500 in currency. He said he guessed I was entitled to it, that he had started the boys up. I thanked him. I put it away in a closet. I did not count it. My father said there were $1,500. I afterwards counted it. I didn't tell anybody my father gave me this. A couple of weeks afterward I told Albert that father had given me $1,500. I met him on the street in Oxford Junction and he asked me if he could get some money. He said he would like $1,500. A couple days afterward I went out to his place and handed him the $1,500. I asked him if he wanted that money now, and he said yes. I gave him the money, didn't count it then. He thanked me, and I told him he was welcome. The note of $3,500 heretofore set out was to cover these three loans. I didn't give this debt in for taxation. I asked him to give me a note for that amount, $3,500, and he said

he would. He didn't offer me a note, I asked him for it. I thought I was entitled to it, and he said all right. I wrote the note and he signed it. That was in 1926. The note drew 5 per cent interest. That was agreed upon between us. I took the note back with me to town and put it in a small box, where I kept it until I went to Nebraska in 1931. I had other notes in this box. I took the note with me to Nebraska and kept it in the house. Albert paid me no interest on the note. I asked him for interest in '32. He said he didn't have any money. I didn't get any more from him at that time. He didn't offer to give me any security and I didn't ask for any at that time. I went back to Nebraska in March, 1932. I did not talk to anybody about the financial standing of my brother Albert; neither did anyone tell me anything about it; I didn't make any inquiry. So far as I knew, Albert was in just as good a position in March '32 as he was any time previous to that. I had not received any information that he was uncertain financially. Since the last-named date I have not been back to Jones county until a week ago to look after my interest in the property. I thought it was part of his (Richmann's) duty as administrator to rent the property, that is the reason I wrote him about it. That was in the fall, November or December, '32. I wrote the letter (set out heretofore) and mailed it to my brother.''

The witness explained the keeping of the money in the glass jar in the basement:

''I figured it was just as well off there as it was in the bank. It was just as safe there as it was in the bank. From 1920 to 1926 my wages ranged down from $65 to $45 per month. In '32 and '33 it was $25 a month. Whenever I picked corn the amount I received was not included in my wages. Got 5 to 10 cents a bushel for picking corn.''

The testimony of the defendant Charles F. Miller, and other testimony in the case, shows conclusively that this deed was given wholly as security, and therefore, in equity, it amounts to nothing more than a mortgage. This being true, it necessarily follows that Charles F. Miller stands in the position of one who has a mortgage on this property, and that is the measure of his interest therein. The written instrument which creates his right was, in fact, duly recorded before the plaintiff commenced his

first action, and long before Albert was adjudged a bankrupt. Charles' lien on this property by reason of his mortgage, therefore, is superior to the rights of either the plaintiff or the intervener to the extent of the amount due on said promissory note, plus interest as therein provided.

2. As between the intervener and the plaintiff a different question arises. As heretofore stated, under the first case brought by the plaintiff for the foreclosure of the chattel mortgage, an attachment was issued which antedates the bankruptcy by more than four months. In that case foreclosure was decreed and judgment entered against Albert for something over $3,300. That decree bore date of December 28, 1932. It reserved jurisdiction for further determination of the rights under the attachment. The intervener insists that the plaintiff acquired no lien by reason of the attachment, and therefore that the intervener's rights are superior to those of the bank; the thought being that the attachment was invalid, and hence no lien was acquired by the alleged levy thereunder.

One assault made on the validity of this attachment is that no petition was filed as provided by Code sections 12078 and 12079. An inspection of the record shows that the plaintiff commenced the original action, and did not ask for attachment. Subsequently, by amendment, certain allegations were made and attachment was asked for and issued and levy made. We have lately held in the case of A. D. Fletcher & Son v. Gordon, 219 Iowa 661, 259 N. W. 204, that under such conditions the court had no jurisdiction to order an attachment, and if one was issued, it was without jurisdiction. Applying this rule to the situation before us, it must be held, therefore, that no lien was acquired by the plaintiff by reason of the attachment proceedings.

On the other hand, however, at the time said decree of foreclosure of the chattel mortgage was entered, to wit, on the 28th day of December, 1932, a general judgment was entered against the defendant Albert N. Miller. Under section 11602, this judgment immediately upon its rendition became a lien upon all the real estate owned by the defendant at the time of said rendition, and also upon all he subsequently acquired for a period of ten years from the date of the judgment. We therefore think that the judgment thus rendered against Albert N. Miller was a lien on all of Albert N. Miller's interest in the real estate lying in

the county where said judgment was entered, and to this extent the lien acquired thereby by the plaintiff is superior to the rights of the intervener.

In reaching the conclusion aforesaid, we have not lost sight of the contentions made by the intervener involving the question of secret reservations as between Albert N. and Charles F. Miller. We have given attention to the authorities cited on this proposition, and they seem to be quite uniform that there must be an agreement, either express or implied, between the grantor and the grantee before this line of cases applies. There is nothing in the record to show that there was any agreement or understanding whatever between Charles F. and Albert N. Miller that could bring this case within this line of authority. As heretofore stated, the letter written by Charles to Albert just prior to the execution of this deed demanded that Albert give Charles security for the indebtedness. This letter was written while Charles F. was in Nebraska, and the answer to it by Albert was the execution and forwarding to Charles of the deed in controversy. The record is wholly silent in so far as a showing of anything more that could be construed into an agreement or understanding between them which amounted to a secret reservation. It is our conclusion, therefore, that the status of these parties with relation to this real estate is determined as follows:

Charles F. Miller has the first lien on this property, for the amount due on the promissory note in evidence, to wit, $3,500, plus interest in accordance with the terms of the note.

The plaintiff receiver has the second lien to the amount due on his judgment of December 28, 1932, plus interest as provided by law, on the Jones county land only. The intervener has the second lien on the Cedar county land, and the third lien on the Jones county land.

Reversed.

The Chief Justice and all Justices concur.